**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Deborah L. Farstad, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | Case No. 4:07-cv-029 |
| | ) | |
| Defendant. | ) | |

Plaintiff, Deborah L. Farstad ("Farstad"), seeks judicial review of the Social Security Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433.  Chief Judge Hovland has referred this matter to the undersigned for preliminary consideration.

I.      BACKGROUND

        A.      First application for DIB benefits

        Farstad first filed an application for disability insurance benefits (DIB) on August 20, 2001, claiming she had been disabled since March 31, 1999.  Farstad's claim was denied by the Commissioner.  She requested a hearing before an ALJ.  On March 20, 2003, the ALJ (Harold Herseth)  denied her claim for benefits.  She sought review by the Appeals Council, which denied her request for review and adopted the ALJ's decision as the final decision of the Commissioner.

        Farstad next sought review in this court.  On September 28, 2004, Chief Judge Hovland issued an order upholding the Commissioner's decision.  Farstad v. Barnhardt, Civil No. A4-04-019, Memorandum and Order dated January 28, 2004.   Farstad did not appeal this decision.

**B.      Procedural history of the second application for DIB**

While Farstad's first action was still pending before this court, she filed a second, protective application for DIB on July 28, 2004, alleging that she had been disabled since March 31, 1999. (Tr. 500).  Her application was denied initially and upon reconsideration, which prompted her to request an administrative hearing.  (Tr. 484-86, 494-91, 493).

The case was assigned to ALJ Donald Holloway, who conducted an administrative hearing on November 10, 2005.  During the hearing, Farstad amended the alleged onset date of her disability to March 21, 2003.  This was the day after her initial application for DIB was denied by ALJ Herseth, which later became the final decision of the Commissioner.  (Tr. 1399-1400).  Following the hearing, the record was supplemented with additional medical records from the Mayo Clinic and Trinity Hospital which addressed evaluations and treatment that had taken place in late 2005 and the first part of 2006.

ALJ Holloway issued his decision on July 10, 2006.  He concluded that Farstad was not disabled at any time from the amended onset date of March 21, 2003, through March 31, 2006, which was the last date she had acquired sufficient quarters of coverage to remain insured.  (Tr. 432-447).

On August 31, 2006, Farstad next sought administrative review by the Appeals Council. (Tr. 1162-1165).  She also submitted additional medical records, most, but not all of which, relate to the period after March 31, 2006, that were considered by the Appeals Council.  (Tr. 425)

The Appeals Council denied Farstad's subsequent request for review and adopted the ALJ's decision as the final decision of the Commissioner.  (Tr. 422-428).  Thereafter, on April 5, 2007,

Farstad filed a complaint with this court seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

### C.   General background

Deborah Farstad was born on September 7, 1959.  (Tr. 500).  She was 46 years at the time of her administrative hearing.  (Tr. 1403).  She graduated from high school and has completed almost two years of college course work.  (Tr. 1403).  She holds no advanced degrees, however. (Tr. 1403).  She worked for a time at Rochester Tel and later as a manager at Minot Tel.  (Tr. 822).  She subsequently served as the general manager/vice president of an internet startup she co-founded with her brother in 1994.  (Tr. 17, 822).  She left the business after its incorporation in 1999.  (Tr. 822). She has not engaged in any substantial gainful activity since 2001.  (Tr. 1406).

Farstad has a history of obesity, hypothyroidism, edema, and migraine headaches.  (Tr. 633-57, 753-60, 834-71).  Her migraines reportedly strike three to four times per month and can last up to three days.  (Tr. 18, 1408).

Farstad has also been diagnosed with anxiety and bipolar affective disorders.  (Tr. 18, 1408-09).  She experiences alternating periods of depression and mania.  (Tr. 1409-10).  She claims her bouts with depression last days or sometimes weeks, making it difficult for her to get out of bed and care for her daughter.  (Tr. 1408-09).  She has a tendency to spend compulsively during her manic episodes; she estimates that she has spent in excess of $100,000 during these episodes, seriously damaging her finances in the process.  (Tr. 1409).

Farstad has at various times taken Imitrex, Relpax, and Oxycodone for pain relief.  (Tr. 1408).  She has at one time or another been prescribed a wide assortment of medications for her other ailments, including Seroquel, Lexapro, Clonazepam, Metformin, Norvasc, Nexium,

3

Levothyroxine, Zetia, Climara, Gemfibrozil, Promethazine, Ativan, Klonopin, Imitrex, Norflex, and Vistaril.  (Tr. 584, 611, 962, 964).[1]   She complains that this medicinal cocktail often leaves her feeling fatigued and confused.  (Tr. 390, 1404).

Farstad also complains that her condition has adversely affected her reaction time, ability to concentrate, and memory. (Tr. 19, 1404-06).   As an example of how it has impacted the latter, she cites her difficulties in retaining material she has just read.  (Tr. 1404).

### D.   Medical history

The medical evidence will be addressed first in terms of Farstad's claims of mental impairment, but with the caveat that much of the same evidence is also relevant to the claims of physical impairment, that the claims of mental and physical impairment are overlapping, and that what is important is the combined impact of all of  the claimed impairments.

### 1.   Mental impairments

### a.   January to June 2003 and the assessment by psychiatrist Dr. Anderson

As of the amended onset date of March 21, 2003, Farstad was under the care of psychiatrist Dr. Shamin Anwar and was regularly receiving therapy from  Jean Frueh, M.A., LLPC.  During the period from January through March 2003, notes from Farstad's therapy sessions indicates that the discussions focused upon Farstad's  manic behavior, compulsive shopping, difficulty sleeping, and fluid retention. (Tr.  834-35 840, 842-43, 847-49, 851-52).

Farstad presented to Dr. Anwar on March 25, 2003.  (Tr. 832-833).  According to Dr. Anwar, she was alert, oriented, and exhibited "pretty good" concentration.  (Tr. 833).  Her recent memory

---

[1]By Farstad's count she has been prescribed in excess of thirty different medications that she takes as needed. See Docket No. 10 (Plaintiff's Brief in Support of Summary Judgment, at 4).

was "mild to moderately impaired."(Tr. 833).  Her impulse control and reliability were "fair."  (Tr. 833).

Farstad submitted to a two-day neuropsychological examination by a psychiatrist, Dr. Thora Anderson, in the Spring of 2003.[2]  She reported difficulties with concentration, memory, communication skills, dizziness and difficulties with concentration and memory.  (Tr. 822).  On examination, she was alert, fairly well oriented, and exhibited no overt attentional lapses or comprehension difficulties  (Tr. 822-23).  Her thought process was logical and goal oriented.  (Tr. 822).  Her insight, reasoning, and judgment appeared adequate.  (Tr. 822).  Her affect was mildly depressed, however, and her speech was somewhat slowed, slurred, circumstantial, and tangential.  (Tr. 822).  Tests results revealed the following:

1. High average auditory attention and concentration.
2. Average language functioning including adequate basic math skills.
3. Overall average learning and recall of verbal and visual information.
4. Average visuospatial functioning.
5. Average to high average executive functioning.
6. Markedly slowed visuomotor speed.

(Tr. 824).  Dr. Anderson concluded that Farstad was not experiencing cognitive impairments at the time of the examination but acknowledged that she "may perceive cognitive difficulties as her mental health and physical status fluctuate."  (Tr. 824).  Dr. Anderson further opined that she could benefit from reducing her stress, attending cognitive rehabilitation sessions, and participating in a "social skills/adult psychotherapy" group.  (Tr. 824).

Farstad thrice visited her therapist in May 2003.  (Tr. 819, 826-27).  Her primary concerns appeared to be anxiety and the onset of multiple physical problems.  (Tr. 819, 826-27).  By month's

_____

[2]The examination was conducted over two days–April 8 and May 15, 2003.  (Tr. 821-25).

end she was reporting improvement in her mental acuity, concentration, and general physical condition.  (Tr. 819).

Farstad returned to Dr. Anwar on May 20, 2003. Dr. Anwar noted that her mood had significantly improved, that she was "much more alert," and that she exhibited no signs of mania or psychosis.  (Tr. 820).  Dr. Anwar also noted that her attention and concentration, although improved, remained impaired and that her judgment was limited.  (Tr. 829).

Farstad met with Dr. Anderson on June 11, 2003, to review the results of her neurological examination.  (Tr. 817).  According to Dr. Anderson's notes, Farstad had given thought to "taking a course at MSU" and expressed interest in "returning to some sort of work."  (Tr. 817).  Farstad also revealed that she had been accepted into the Trinity Adult Partial Hospitalization (TAHP) program.  (Tr. 817).[3]

Farstad met with therapist Frueh on June 11, 2003.  (Tr. 818).  According the therapist's notes, Farstad was nervous about starting the TAPH program but was otherwise thinking more clearly, no longer struggling with concentration or memory, and feeling better overall.  (Tr. 818).

**b.      Assessment by psychiatrist Dr. Anwar in June 2003**

On June 18, 2003, at the request of Farstad's attorney, Dr. Anwar completed a "Mental Impairment Questionnaire" that covered the period of April to June 2003 (Tr. 902-909).  He found Farstad's psychiatric disorders were relatively stable, but still caused cognitive impairment and emotional liability.  (Tr. 902). He indicated that she had no medication side-effects.  (Tr. 902).  Dr.

---

[3]Farstad participated in the TAHP program from June 16, 2003, until July 10, 2003.  (Tr. 976).  There, she received "dialectical behavioral therapy in group, individual and education training format."  (Tr. 1040, see generally Tr. 976-1115).  Staff observed at the time of her discharge that, throughout the course of the program, she "would seek medications, and then when she had them not take them."  (Tr. 977).  They further observed that she appeared able to utilize emotion regulating techniques she had learned while participating in the program and seemed more comfortable being alone.  (Tr. 977).

Anwar believed that Farstad had "limited but satisfactory" ability to understand, remember, and carry out very short and simple instructions, make simple decisions, and ask simple questions. (Tr. 905). In all the remaining categories, he found that her abilities were either "seriously limited but not precluded," or that she was "unable to meet competitive standards." (Tr. 905-06). Dr. Anwar concluded that Farstad had "moderate" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" deficiencies of concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 908). He further indicated that Farstad had a "complete inability to function independently outside the area of [her] home," and would miss more than four days of work per month. (Tr. 908).

**c.**   **June to December 2003 and participation in the TAPH program**

Farstad returned to her therapist on June 25, 2003, with complaints of mild anxiety and difficulty sleeping. (Tr. 816). She noted some progress in the TAPH program as well as a boost in her confidence and self-esteem. (Tr. 816). Feeling more in control, she also shared her plan to build a new home. (Tr. 816).

Farstad reported continued progress in the TAPH program during subsequent visits to her therapist. Specifically, on July 2, 2003, she reported that her concentration had improved, that she was again able to read books, and that she could head off panic attacks through the use of anxiety management strategies. (Tr. 814). She planned to build a new home and "open up a store to sell on a scheduled basis with clients some of the things that she has stored in her home and things that she has bought in the past[,] and plan[ned] on renting a building." (Tr. 814). In response, her therapist cautioned that her newfound energy and growing enthusiasm were indicative of the onset of a manic

episode.  (Tr. 814).  Her therapist nevertheless acknowledged on July 11, 2003, that she had made significant progress.  (Tr. 811).

Farstad's therapist expressed similar sentiments following visits with Farstad in July and August 2003; her treatment notes from July and early August state that Farstad had made significant progress, was in charge of her emotions, and appeared to be coping quite well.  (Tr. 806-09).  She did, however, document that Farstad had again begun reporting symptoms of mania and difficulty sleeping on August 28, 2003.  (Tr. 2004).

On August 29, 2003, Farstad reported to Dr. Anwar, who described her impulse control as tenuous, her thought process as somewhat scattered, and her concentration as somewhat impaired. (Tr. 803).  Farstad returned to Dr. Anwar on September 5, 2003, demonstrating more focus, exhibiting good concentration and memory, and appearing to be in generally good spirits.  (Tr. 802).

Farstad next visited her therapist on September 19, 2003.  (Tr. 801).  She "denied any significant highs or lows" and appeared to be coping quite well with the stressors in her life.  (Tr. 801).

Farstad returned to her therapist on October 3, 2003, concerned about fluctuations in her energy level,  but otherwise "doing well."  (Tr. 800).  Her therapist attributed her lack of energy to her recent move, noting that her mood was normal and appeared to be coping well with the changes in her life.  (Tr. 800).

Farstad reported to Dr. Anwar on October 7, 2003, that, aside from some family stress, her mood remained congruent and, with the use of the insomnia medication, her sleep had improved. (Tr. 799).  Farstad similarly advised her therapist on October 17, 2003, that her sleep had improved and that her mood remained stable.  She took up outdoor photography as a hobby.  (Tr. 798).

Farstad reported to Dr. Anwar on December 23, 2003, that her medications had taken hold and that she was feeling emotionally stable. (Tr. 797). Farstad expressed similar sentiments during a February 2, 2004, visit with Dr. Anwar, reporting her mood had stabilized following an increase in her prescribed dose of Seroquel. (Tr. 796). Dr. Anwar renewed her prescriptions for Lexapro, Seroquel, and Klonopin, and Sonata. (Tr. 796).

### d.       January 2004 to October 2004

Farstad reported to Dr. Anwar on February 10, 2004. (Tr. 796). She exhibited no evidence of depression or mania, was compliant with her medications, and reported no adverse side effects. (Tr. 796). She returned on March 16, 2004, apprising Dr. Anwar of her decision to enroll in an exercise program. (Tr. 795). Dr. Anwar found her to be coherent and more focused than she had been in the past. (Tr. 795).

Farstad continued to make monthly visits to her therapist. (Tr. 786-793). Notes of visits from March through May 2004 indicate that Farstad was giving thought to starting a new business. (Tr. 786, 793). They also state that Farstad was struggling with her weight, was having difficulty sleeping, felt hypomanic at times, and seemed dissatisfied with the direction her life had taken. (Tr. 786-793).

On May 20, 2004, Farstad reported to a family nurse practitioner, Tonya Anderson, for a medication followup. (Tr. 787). According to Nurse Anderson's notes, Farstad continued to struggle with her weight but was exercising daily, found her anxiety to be more manageable, and was no longer having problems sleeping. (Tr. 787). Farstad returned to Nurse Anderson on May 24, 2004, however, complaining of increased anxiety, restlessness, and shakiness of the hands. (Tr.

787).  Nurse Anderson responded by terminating a medication recently prescribed to Anderson.  (Tr. 788).

Farstad's next appointment with Nurse Anderson was on June 9, 2004.  (Tr. 785).  She claimed to be doing quite well as far as her concentration, energy, and mood were concerned.  (Tr. 785).  She returned for another medication followup on June 23, 2004. (Tr. 783).  Arthritis flare-ups and fluid retention had given her discomfort but were nevertheless manageable.  (Tr. 783).  She appeared stable from an emotional standpoint, denying any troubles with her mood, energy, appetite, concentration, or sleep.  (Tr. 783).  She also found that she was able to cut back on some of her medications.  (Tr. 783).

Farstad returned to her therapist in late July and August 2004 with concerns about what she characterized as "mini-episodes of mania." (Tr. 777-78, 781).  She also expressed frustration about recent weight gains, her lack of will power, her ongoing physical or medical difficulties, and what she characterized as her inability to establish a working relationship with her treating physician. (Tr. 777-78, 781).

Farstad expressed some concern about hypomanic episodes during a July 28, 2004, meeting with Nurse Anderson.  (Tr. 779).  However, in a meeting the following month, she advised Nurse Anderson that she was doing fairly well, was able to get more involved, and did not feel any adjustments in psychiatric medications were necessary.  (Tr. 775).

Farstad next met with her therapist on September 3, 2004. (Tr. 772-74).  Although she raced through the session, she denied any symptoms of mania.  (Tr. 772).

Meanwhile, Farstad continued to submit to monthly medication followups with Nurse Anderson.  Notes dated September 24, 2004, state that she was doing better from a physical

10

standpoint but otherwise felt lethargic.  (Tr. 772).  They also reveal that she had enlisted an advisor to manage her finances.  (Tr. 772).  Notes dated October 25, 2004, state that her affect, while bright, was not manic, that she was exploring business opportunities for herself (a shopper service business), feeling better physically, and exhibiting good energy, insight, and concentration.  (Tr. 770).

> **e.    Assessment by the agency psychologist Dr. Hase and the remainder of 2004**

On October 26, 2004, H.D. Hase, Ph.D., an agency clinical psychologist, assessed Farstad's mental residual functional capacity.  (Tr. 884-898).  He noted Farstad's struggles with substance abuse and anxiety as well as her difficulty coping with change and managing her finances.  (Tr. 886).  Dr. Hase found that Farstad's disorders produced "moderate" restrictions in activities of daily living, "mild" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence, or pace.  (Tr. 898).  As to specific work activities, Dr. Hase found Farstad had some "moderate" limitations (in working in proximity to others, setting goals, and responding to changes), but was "not significantly limited" in most categories.  (Tr. 884-85).  He found "no evidence in limitation" in Farstad's ability to understand, remember, and carry out short and simple instructions (Tr. 884).  Overall, he was of the opinion that Farstad did not exhibit cognitive dysfunction and did not suffer from a mental disability.  (Tr. 886).

Farstad met with Anderson on November 24, 2004, for another medication followup.  (Tr. 768).  She reported that she was doing fairly well, that her physical health improved, that she had lost some weight, was more physically active, and that she was continuing to work on her shopper service business.  (Tr. 768).  She also reported that her mood had greatly improved, "especially as

11

far as her concentration and cognitive thinking." (Tr. 768). She refused to attribute recent business expenditures to any manic episodes. (Tr. 768).

Farstad returned to her therapist on December 16, 2004. (Tr. 767). The two discussed her involvement in several business ventures, recent weight loss, and decision to take back control of her finances. (Tr. 767).

### f.   January 2005 to December 2005 and assessment by Nurse Anderson

Farstad presented to her therapist twice in January 2005. (Tr. 765-66). She complained of mood swings over the holidays and exhaustion, which she attributed to "displaying her business wares at a showing over the weekend." (Tr. 765-66). She also reported some concentration difficulties as well as occasional irritability with the caveat that her prescription for Ativan had helped. (Tr. 766). She added that she had been busy of late with her new business.

Farstad returned to her therapist twice in February 2005. (Tr. 762-64). The two discussed Farstad's anxiety, concerns regarding her medical care, ability to process grief, and mechanisms she could utilize to help cope with stressors in her life. (Tr.762-63). According to the treatment notes, Farstad had utilized coping strategies, was continuing to lose weight, and felt less anxious. (Tr. 762).

Farstad next met with her therapist on March 14, 2005. (Tr. 1145). She reported that she had been doing well, that her mood was stable, and that she had just returned from a business trip to Las Vegas. (Tr. 1145). However, she complained of sleep troubles. (Tr. 1145). She questioned whether some of this trouble " related to the avoidance of the enormity of the tasks that she needs to complete in setting up and maintaining her business." (Tr. 1145).

Farstad reported to Nurse Anderson on April 7, 2005, for a medication followup.  (Tr. 1143).
According to Nurse Anderson's notes, Farstad expressed concern about sleep difficulties, feelings
of depression, and recent weight gains.  (Tr. 1143).  Nurse Anderson responded by adjusting
Farstad's medication with the provision that she continue meeting with her therapist.  (Tr. 1144).
 The notes state that Farstad also reported:

> She is working on some of the business related issues and has tried to identify some
> problem-solving techniques to help her out. She currently has all of her inventory in
> her garage and admits that every time she pulls in and out of her garage she sees this
> mound of work that needs to be done; however, she does not have the space to do it.
> She has since rented a building and is finding that this is actually reducing some of
> her stresses. She has also contacted individuals who will want to display some of her
> work there, and she will take some profit for doing this. She has identified that she
> will not be able to consistently open every day as she struggles making 20 hours a
> week as far as working and does not feel that she can do 40 hours a week. She has
> identified that it may be more successful if she open [sic] in the evening hours as this
> is when she functions the best or right as she gets out of bed in the morning.

(Tr. 1143).

Farstad reported for an another medication followup on May 18, 2005.  (Tr. 1141).  During
this visit she reported increased struggles with her depression as well as a lack of motivation, weight
gain, and physical discomfort (which she associated with menopause).  (Tr. 1141).  Additionally,
she admitted to "feeling somewhat overwhelmed as she [was] opening a new business and helping
her nephew with this process."  (Tr. 1141).

Farstad next reported to her therapist on July 19, 2005.  (Tr. 1139).  Her therapist noted that
Farstad was continuing to struggle with depression and losing interest in her business.  (Tr. 1139).

Farstad returned to her therapist on July 29, 2005.  (Tr. 1135). According to the treatment
notes, she appeared tired and was continuing to take 2-hour naps daily. (Tr. 1135).  She was anxious

about "staying on track" and avoiding a manic episode but exhibited no symptoms that would indicate mania.  (Tr. 1135).

Farstad also visited Nurse Anderson on July 29, 2005.  (Tr. 1137).  Nurse Anderson's notes indicate that Farstad was struggling with increased feelings of depression, had an irritable affect, and was expressing dissatisfaction with her primary healthcare providers.  (Tr. 1137).

Farstad returned to her therapist on August 31, 2005.  (Tr. 1134).  She felt tired, was concerned about recent memory lapses , but otherwise considered herself to be in fairly good health. (Tr. 1134).  She discussed "feeling 'overwhelmed' with paperwork at home involving her investments and engaging in some behavior procrastination."  (Tr. 1134).  Her therapist observed that her mood had improved.  (Tr. 1134)

Farstad reported for her next medication followup on September 1, 2005.  (Tr. 1131).  She complained of forgetfulness, migraine headaches, and daytime fatigue.  (Tr. 1131).  She also reported that she had been helping her nephew with his business on a volunteer basis.  (Tr. 1131). Nurse Anderson recommended that Farstad continue self monitoring but found no reason to adjust her medication.  (Tr. 1132).

On October 16, 2005, Nurse Anderson completed a "Mental Impairment Questionnaire" covering the period from May 2004 to October 2004, at the request of Plaintiff's attorney.  (Tr. 910-919).  She believed that Farstad was either "unable to meet competitive standards" or had "no useful ability to function" in 20 of the 26 categories (Tr. 913-16).  She concluded that Farstad had "moderate" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" deficiencies of concentration, persistence or pace; and one or two extended episodes of decompensation.  (Tr. 917).  Ms. Anderson also felt that Plaintiff had a "complete

inability to function independently outside the area of [her] home," and that she would miss about four days of work per month.  (Tr. 918).

Farstad's next medication followup was on November 17, 2005.  (Tr. 1129).  According to Nurse Anderson's notes, Farstad was not as emotionally reactive as she was in the past, was in a "pretty good mood," appeared more insightful in discussing her situation, and exhibited "appropriate decision-making choices."  (Tr. 1129).  Farstad reported that she continued to suffer from occasional bouts of depression lasting two or three days but that they were less intense.  (Tr. 1129).  She also reported that Ativan had helped her to manage her anxiety.  (Tr. 1129).

### g.      January 2006 to March 31, 2006, and the Mayo Clinic evaluation

Farstad reported for a medication followup on January 10, 2006.  The records state that Farstad was feeling a bit more stressed and depressed than on previous visits, and was taking pain medication to combat significant headaches.  (Tr. 1159).  They also reference discussions between Nurse Anderson, Farstad, and Farstad's sister about possible adjustments to Farstad's medications as well as a referral to the Mayo Clinic. (Tr. 1159-60). Farstad also indicated that she had turned responsibility of her finances over to a local accountant.  (Tr. 1159).

Farstad underwent a comprehensive medial assessment at the Mayo Psychiatry & Psychology Treatment Center in Rochester from January 20, 2006, to January 31, 2006, for both her mental and physical complaints.  In terms of her mental impairments, Mayo's ultimate diagnosis was essentially the same as her other medical-care providers, *i.e.*, Bipolar Disorder, probably type 1, mixed along with Generalized Anxiety Disorder and Borderline Personality Disorder.  (Tr. 1151). During her stay at Mayo, Farstad's medications were altered and she was given some tools to help address her mental impairments, including journaling.  (Tr. 1147-1152).  The evaluation reported that her mental condition had improved during her stay and that she was discharged in good

15

condition.  (Tr. 1151). Farstad was noted to be "[c]ompletely independent in all ADL's [activities of daily living]," but that she would require ongoing psychiatric care for medication management and psychotherapy. (Tr. 1152). While the Mayo evaluation did not address Farstad's ability to work, the evaluation did not set forth any restrictions in that area.  (Tr. 1147-1152).

Following her return from Mayo, Farstad continued with treatment and followup medication visits with her therapist and Nurse Anderson.  Notes from Nurse Anderson dated February 3, 2006, describe Farstad as a "very bright, much more insightful, pleasantly appearing 46-year old female" who was in a good mood, had clear thought processes, and was denying any troubles with her energy, appetite, concentration, sleep, or mood. (Tr. 1157).  During this visit Farstad acknowledged she had made some poor choices in the past, including not taking her medications consistently, and that she had a plan for recovery that included more regular hours, better diet, and physical activity. (Tr. 1157).

On February 16, 2006, Farstad met with her therapist.  Notes indicate that Farstad had not been following through with the recommendations of her therapist or the Mayo Clinic.  When asked how she was doing, Farstad reported she was "plugging along" and stated she was going to be closing her store at the end of April.  She reported that she was now sleeping from 10:30 at night until 6:00 or 7:00 in the morning.  (Tr. 1243).

Farstad met again with her therapist on February 23, 2006.  She discussed her inability to fully follow through on the recommendations that had been made by the Mayo Clinic in terms of daily homework assignments.  She reported feeling exhausted from two nights of poor sleep.  She reported feeling pressured by family who have daily contact with her to try to keep her on track.  She reported that she was unable to keep the physical or emotional investment in her business, that she

16

has not been able to work a full day, and that she needed to turn it over to her nephew, which would be a weight off of her shoulders.  (Tr. 1240).

Farstad returned for a medication followup with Nurse Anderson on March 8, 2006.  Farstad reported that she had been feeling a bit more depressed because of a recent illness, had quit taking afternoon naps, had given thought to decreasing her meds, and had transferred all of her business work to her office in her home and that this had been more productive for her.  (Tr. 1154).  At Nurse Anderson's suggestion, she agreed to go back to her napping.  (Tr. 1154).  She also visited with her therapist on March 8, 2006, and reported and discussed essentially the same things.  (Tr. 1238).

Farstad's condition remained essentially unchanged according to the notes of additional therapy sessions in March 2006 and a medication followup on March 29, 2006.  (Tr. 1227-1235).

> **h.**      **Post March 31, 2006, the assessment by Dr. Dragicevic, and the involuntary commitment for drug abuse**

The records after March 31, 2006, her last date of eligibility for SSA benefits, suggest that over the next several months she became more depressed and lethargic.  As a consequence, she increased her therapy sessions to once a week.  But, as will be explained in a moment, this may very well have been the result of her drug abuse spiraling out of control.  (Tr. 1314)

In September, 2006, Farstad's mother called an ambulance and attempted to get her committed, believing that she was slurring her words, that she was over-sedated, and that she likely was abusing prescription medications.  Farstad denied these allegations at the time and convinced the ambulance attendants that she was not in distress.   (Tr. 1188)

On October 1, 2006, Dr. Todor Dragicevic, a Minot psychiatrist, completed a mental impairment questionnaire that was part of the submittal of supplemental information to the Appeals Council.  In the questionnaire, Dr. Dragicevic described Farstad's mental impairment as overall

seriously limited and unable to meet competitive standards in most areas with marked functional limitations and four or more episodes of decompensation within a twelve month period.  (Tr. 1166-75)   The assessment, however, only covered the period from September 12, 2006 to October 19, 2006, which is after the eligibility cutoff date.  (Tr. 1175)  Further, the assessment was made upon the assumption that Farstad had been substance abuse free for many years; hence, this was not a contribution to the mental impairment.  (Tr. 1174-75).  As noted next, however, this was not the case.

In late October 2006, just prior to Halloween, Farstad fell while standing on a ledge and hit her head on the corner of a coffee table.  She was knocked out for a period of time.  When she awoke, she called her ex-husband, a local physician, for help.   At that point, she was involuntarily committed to a local psychiatric unit.  There it was discovered that she had THC in her system, and Farstad acknowledged she had been abusing prescription drugs for a long time and smoking marijuana since 1999.   (Tr. 1178-1182, 1300, 1305, 1308).  One of the reports generated as a result of Farstad's involuntary commitment discussed her history of substance abuse including:  the use of alcohol and street drugs during her teenage and early adult years; her seventeen years of abstinence during which she became a "workaholic;" and the fact that, at age 40, she resumed her use of marijuana (smoking up to 1-2 bowls, 3-4 times a day) and began abusing prescription drugs, which escalated to using Ativan, Klonopin, Oxycodone, OcyContin, Hydrocodone, and Codeine. (Tr. 1308).  This report is consistent with several local physicians back in 2004 refusing to prescribe more medications with narcotics because of concerns of abuse as discussed in the next section  (Tr. 595-605) and a review of more recent pharmacy and BCBS records (Tr. 1300, 1304-1305).

### 2.      Physical impairments

In addition to the foregoing, the following is also relevant to Farstad's claims of physical impairment.

#### a.      Treatment by Dr. Thomas-Eapen and Dr. Diri in 2003 & 2004

Farstad first presented to Dr. Thomas-Eapen for a physical examination on December 6, 2002. (Tr. 653). She returned to Dr. Thomas-Eapen several times in the following months with alternating complaints of edema, fatigue, sleep difficulties, and leg pain. (Tr. 637-50). Dr. Thomas-Eapen, in consultation with Farstad's psychiatrist(s), ordered several tests and adjusted her medications accordingly. (Tr. 637-50). Dr. Thomas-Eapen's notes reflect that Farstad's edema began showing improvement by March 2003. (Tr. 631)

Farstad apparently discontinued all of her medications, including all of her psychiatric medications, in April 2003. (Tr. 626). She went back on several of her meds in early May 2003, however, after falling ill. (Tr. 626).

Farstad presented to Dr. Thomas-Eapen on May 5, 2003, with complaints of severe neck pain, back pain, muscle spasms, and swelling of her fingers and toes. (Tr. 623). Dr. Thomas-Eapen's initial impression was that Farstad suffered from a viral syndrome causing arthralgias and arthritis. (Tr. 624). She started Farstad on Toradol, Celebrex, and Norflex. (Tr. 625).

Farstad returned for a follow-up examination on May 12, 2003. (Tr. 621). According to Dr. Thomas-Eapen's notes, Farstad was feeling "much better" and reported tremendous improvement in her symptomology after taking Prednisone, a prescribed corticosteroid. (Tr. 621).

Farstad next reported to Dr. Thomas-Eapen on July 22, 2003, with concerns about her blood pressure and migraines. (Tr. 617). Dr. Thomas-Eapen's notes of this visit suggest that Farstad's concerns were well founded as she was suffering from hypertension and had been experiencing more

19

migraine episodes.  (Tr. 617).  Dr. Thomas-Eapen attributed Farstad's condition to stress, recommending that she continue to monitor her blood pressure at home and return within a week. (Tr. 619).

Farstad reported to Dr. Erdahl Diri on June 9, 2003.  (Tr. 677).  A physical examination did not reveal any active synovitis findings.  (Tr. 677, 681). Diagnostic imaging of both hands showed no arthritic response.  (Tr. 704).  Dr. Diri deemed these results inconclusive, however, by virtue of the fact that Farstad had recently undergone systematic steroid therapy.  (Tr. 677, 681).  He proceeded to increase Farstad's Celebrex prescription and recommended that she return in six weeks for a follow-up examination.  (Tr. 682).

Farstad returned to Dr. Diri for a follow-up examination on July 21, 2003.  (Tr. 677).  During this examination, she expressed her desire to discontinue Celebrex on account of its side effects. (Tr. 677).  In addition, she reported that since being prescribed Amitriptyline by her psychiatrist two weeks prior, she was sleeping better and her joint aches and pains had abated.  (Tr. 677).  Finding that she now appeared to meet the criteria for seropositive rheumatoid arthritis, Dr. Diri started her on Hydroxychloroquine.  (Tr. 678).

Farstad returned to Dr. Thomas-Eapen on July 29, 2003.  (Tr. 615).  According to Dr. Thomas-Eapen's treatment notes, Farstad was experiencing migraines three or four times per week and was still suffering from hypertension.  (Tr. 615).  Dr. Thomas-Eapen started her on Inderal.  (Tr. 616).

Farstad returned to Dr. Thomas-Eapen approximately two weeks later with complaints of fluid retention.  (Tr. 614).  Dr. Thomas-Eapen prescribed her a diuretic.  (Tr. 614).

Farstad returned to Dr. Thomas-Eapen on August 28, 2003, for a reevaluation of her hypertension.  (Tr. 611).  Noting there had been a decrease in the frequency of migraines reported by Farstad, Dr. Thomas-Eapen recommended that she continue taking Inderal.  (Tr. 611).

On September 2, 2003, Farstad returned to Dr. Diri for a consult.  (Tr. 675).  A review of her systems was, in Dr. Diri's words,  negative except for her arthritic problems.  (Tr. 675).

Farstad returned to Dr. Thomas-Eapen on September 19, 2003, this time with complaints of depression and alopecia.  (Tr. 610).  Dr. Thomas-Eapen initially observed there had been a decrease in the frequency of Farstad's migraines, a change she attributed to Farstad's use of Inderal.  (Tr. 609).  Dr. Thomas-Eapen nevertheless directed Farstad to discontinue Inderal out of concern that it was causing the alopecia and started her on Benicar.  (Tr. 609-10).

Farstad contacted Dr. Thomas-Eapen on December 22, 2003, to inquire about a permanent handicap sticker.  (Tr. 607).  Dr. Thomas-Eapen's response was that "it would be difficult for [her] to ok it on medical grounds."  (Tr. 604, 607).

Farstad reported to Dr. Thomas-Eapen on April 5, 2004, with complaints of nasal congestion, back pain, and a "productive cough."  (Tr. 604).  The notes from this visit revealed that Farstad had contacted one of Dr. Thomas-Eapen's colleagues, Dr. Mattson, three days prior about her cough and was prescribed Phenergan with Codeine.  (Tr. 604).  Dr. Thomas-Eapen directed Farstad to continue taking Phenergan as well as Tessalon Perles and Delsym for her cough.  (Tr. 603, 605).  In addition, Dr. Thomas-Eapen ordered chest x-rays.  (Tr. 604-05).  The x-rays revealed nothing abnormal.  (Tr. 606).

Farstad contacted Dr. Thomas-Eapen's office on April 6, 2004, complaining that her prescribed regimen of antihistamines and cough suppressants was not working.  (Tr. 603).  Dr. Thomas-Eapen responded by giving her some Hycodan.  (Tr. 603).

21

The record reflects that Farstad twice attempted to obtain additional narcotics from Dr. Thomas-Eapen's colleagues on April 7, 2004, but was unsuccessful.  (Tr. 603).  She paged Dr. Thomas-Eapen the following day requesting more cough medications.  (Tr. 602).  Dr. Thomas-Eapen expressed concern over her behavior but relented and provided her with a small dose of Phenergan.  (Tr. 602).

Farstad sought cough syrup from Dr. Sarah Mullin on April 16, 2004.  (Tr. 601).  Dr. Mullin denied Farstad's request, however, finding her to be a highly manipulative drug seeker.  (Tr. 601). Dr. Thomas-Eapen echoed this sentiment in her notes dated April 20, 2004.  (Tr. 600).

Farstad subsequently filed a complaint against Drs. Mullin and Thomas-Eapen for their refusals to renew her prescription for Phenergen.  (Tr. 595).  She also transferred her care to Dr. Maya Dillas.  (Tr. 598, 671).

On June 7, 2004, Farstad presented to Dr. Erdal Diri with finger joint pain.  (Tr. 668). She denied any other significant joint pain or swelling.  (Tr. 668).  An examination revealed mild puffiness of Farstad's hands but no other joint swelling and no limitation in her range of motion. (Tr. 669).  Dr. Diri restarted her on hydroxychloroquine, noting that, when taken previously, it had "improved her symptoms quite a bit."  (Tr. 669).

### b.    Assessment by the state agency physician in October 2004

A State agency physician reviewed Farstad's records on October 21, 2004, and concluded that Farstad could:  lift twenty pounds occasionally and ten pounds frequently; stand  and walk for six hours and sit for six hours in an eight-hour workday; engage in limited pushing, pulling and fingering (fine manipulation); and occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 876-83).

### c.      Evaluation by Dr. Lampman in November 2004

Farstad was evaluated by a rheumatologist, Dr. James H. Lampman, on November 19, 2004. (Tr. 956-59). Dr. Lampman suspected that Farstad was suffering from an autoimmune connective tissue disorder as opposed to rheumatoid disease. (Tr. 958). He expressed optimism about Farstad's prognosis and suggested a relatively conservative approach to treatment. (Tr. 954-55).

### d.      2005 and Mayo Clinic evaluation in January 2006

Farstad sought treatment on January 12, 2005, for swelling in her right foot and ankle. (Tr. 663). Two weeks later she again sought treatment for her right foot and was treated for a stress fracture. (Tr. 723).

On June 18, 2005, Farstad presented to the emergency room with left ankle pain and swelling. (Tr. 1125-28). X-rays were negative. (Tr. 1125-28). Farstad was given a narcotic pain medication and discharged. (Tr. 1125-28).

In January 2006, as part of an overall evaluation at the Mayo Clinic, Farstad was examined for the possibility of an inflammatory joint disease. The conclusion was that she had some symptoms consistent with palindromic rheumatism, but that it was not possible to make a definitive diagnosis of rheumatoid arthritis. (Tr. 1150). A number of Farstad's other physical complaints were addressed, including her headaches. An MRI of the head did not disclose any abnormalities that would explain the headaches. One possibility that was considered was adjusting her blood pressure medication and putting her on a beta blocker for migraine prophylaxis and blood pressure management. (Tr. 1150).

e.      **Participation in the Tri-Life Center Program pain management program in November 2006**

Later, in November 2006, while still in treatment for opiate dependency as a result of her involuntary commitment, Farstad entered a three-week pain management program operated by the Tri-Life Center, L.L.P.  The program consisted of group therapy, physical conditioning, stretching, and Tai Chi exercises followed up by home therapy.  (Tr. 1334-1381).  The last followup record of January 10, 2007, following discharge reports that things were going well, that the pain was at a low level, and that the pain was  manageable.  She also reported being able to do the cooking, the laundry, and more home activities than what she was able to do prior to participating in the Tri-Life sessions.  (Tr. 1330-1333).

**E.      ALJ hearing**

Farstad testified that her various ailments and the prescription drugs used to treat them tend to sap her strength, leaving her feeling confused and unable to concentrate.  (Tr. 1404-1406, 1424).  When asked to elaborate further, she testified that she typically experiences in the neighborhood of four migraine headaches per month that last up to three days and leave her bedridden.  (Tr. 1408).  She also testified that she suffers through monthly bouts of depression often followed by manic episodes marked by compulsive shopping. (Tr. 1409).  By her estimation she spent in excess of $100,000 during her last manic episode.  (Tr. 1410).

Farstad went on to testify that while she did reap some benefit from her participation in the Trinity Adult Partial Hospitalization program to the extent that she can now better recognize the onset of her various symptoms, she is still unable to work.  (Tr. 1405-06).  She also emphasized that she is no longer able to engage in outdoor activities, relies heavily on others to assist in the

management of her finances, and has to take daily naps to combat the fatigue brought on by the fifteen different medications that she has been prescribed. (Tr. 1415-20).

The ALJ asked Farstad directly about the concerns that had been raised by some of her physicians regarding the number of different drugs she was taking. Farstad discounted these concerns, suggesting that the physicians who raised them were inexperienced or otherwise unqualified. (Tr. 1419-20). Nevertheless, to assuage any concern of possible dependency issues, she advised the ALJ of her ongoing efforts to reduce her level of medication along with her research of different detoxification programs offered in Minnesota, Nevada, and Texas. (Tr. 1420-21). Notably, Farstad did not reveal during her testimony in November 2005 what she later acknowledged in November 2006, which was that she had been abusing prescription drugs for a number of years and had also been regularly smoking marijuana.

Farstad provided little detail in the way of her daily routine other than she tends to plan her activities around her medications seeing as they make her drowsy. (Tr. 1416). According to Farstad, she has a two-hour window once the medications are in her system to run errands. (Tr. 1416). Upon returning home, she usually takes a two-hour nap, and then begins preparing dinner. (Tr. 1416). Her social calendar is centered around her daughter's school activities. (Tr. 1416). While she is able to travel, she is not inclined to do so alone on account of her anxiety. (Tr. 1425).

At the close of Farstad's testimony, the ALJ posed a series of hypotheticals to James Berglie, a vocational expert. (Tr. 283). First, the ALJ inquired whether a hypothetical individual between the ages of 43 and 46 who possessed Farstad's education and experience could be expected to return to her relevant work competitively if saddled with the following limitations: the ability to lift twenty pounds occasionally and ten pounds frequently; the ability on occasion to climb, stoop, kneel, crawl, balance, and crouch; an inability to do complex technique work for extended periods; and difficulty

understanding, remembering, and carrying out detailed instructions.  (Tr. 1427-28).  Berglie answered in the negative. (Tr. 1428).  The ALJ next asked whether Farstad's skills were transferable to a job that could accommodate the hypothetical individual's limitations.  (Tr. 1428).  Berglie responded there were semi-skilled clerical jobs numbering in the hundreds of thousands nationally and between four and nine-thousand regionally that could make use of this individual's communication, business, and sales skills.  (Tr. 1428).   The ALJ next asked whether this hypothetical individual, if unable to consistently keep a schedule set by others and  further limited to simple, routine, and repetitive tasks, would be able to perform such jobs.  (Tr. 1428).  Berglie responded that an inability to adhere to another's schedule was prohibitive.  (Tr. 1429).

Picking up where the ALJ had left off, plaintiff's counsel asked Berglie whether an inverse relationship existed between an employee's skill level and his ability to adhere to set schedules.  (Tr. 1430).  Berglie responded in the affirmative, explaining that, as an employee's skill level decreased so did his employer's tolerance for frequent absences and extended breaks.  (Tr. 1430).

### F.      ALJ's decision

The ALJ issued his written opinion denying Farstad's application for disability insurance benefits on July 10, 2006. (Tr. 432-447).  When reviewing the application, he employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520.  At the first step, he took note of numerous references in the record to Farstad's efforts in establishing a new business.  (Tr. 435).  Nevertheless, based upon the record as a whole, he concluded that Farstad had not engaged in substantial gainful activity at any time relevant to his decision.  (Tr. 435).

At the second step, the ALJ inquired into whether Farstad suffered from severe impairment(s). In his opinion, Farstad's hypertension, generalized edema, and history of polysubstance dependence had minimal impact on her ability to perform work related activities.  (Tr.

26

435-36).  He did, however, conclude that Farstad suffered from the following severe impairments: bipolar, anxiety, and personality disorders; migraine headaches; obesity; and inflammatory joint disease.  (Tr. 435).

Moving on to the third step of his analysis, the ALJ compared Farstad's impairments to the presumptively disabling impairments listed in 20 C.F.R. § 404, Subpart P, Appendix.  (Tr. 436).  He was not persuaded that Farstad had an impairment or combination of impairments that arose to listing level severity.  (Tr. 436).  He discounted the opinion of Nurse Anderson on the grounds that it lacked support in the record and that she was not an acceptable medical source as defined in 20 C.F.R. § 404.1513.  (Tr. 437).  He did not afford controlling weight to Dr. Anwar's opinion, finding that it was not entirely consistent with the objective medical evidence or the record as whole.  (Tr. 437).  As for assessment of the Disability Determination Service, he determined that it too was not entirely consistent with the record as a whole.  (Tr. 437).  Consequently, the ALJ concluded that the evidence did not establish the presence of the "C" criteria but did indicate that Farstad suffered from the following mental limitations set forth in "Part B" of the mental listings: mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation.  (Tr. 437-38).

At the fourth step of his analysis, the ALJ assessed Farstad's residual functional capacity, that is, her ability to do sustained work-related physical and mental activities in a work setting on a regular basis.  (Tr. 438).  Initially, he acknowledged that Farstad's impairments significantly limited her ability to perform basic work activities and could have reasonably been expected to produce her alleged symptoms.  (Tr. 438-439, 445).  He nevertheless concluded that Farstad's statements concerning the intensity, duration, and limiting effects of her symptoms were not entirely

27

credible in light of inconsistencies he observed between her testimony, written subjective complaints, reported work activities, daily living activities, and the record as a whole. (Tr. 439-446). Based upon his review of the evidence, he determined that Farstad retained the residual functional capacity to:

> occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; has to have some freedom to alternate between sitting and standing; and occasionally climb, stoop, kneel, crawl, balance, and crouch. Mentally, she can understand, remember, and carry out simple, routine, and repetitive work; she can make simple work-related decisions; she can perform at the usual pace with normal breaks; she can set realistic goals and plans independent of others; and she can tolerate brief and superficial contact with the public. This residual functional capacity is supported by the objective medical evidence, the claimant's admitted work activities, the claimant's activities of daily living, and the record as a whole.

(Tr. 446). Given this residual functional capacity, he concluded that Farstad was incapable of performing her past relevant work. (Tr. 446).

Since Farstad's impairments rendered her incapable of performing her past work, the burden at the fifth step shifted to the Commissioner to determine whether there were jobs existing in significant numbers in the national economy that she was capable of performing. (Tr. 446). Relying upon the testimony of the vocational expert, the ALJ determined that Farstad's functional limitations did not significantly erode her occupational base for sedentary work and there existed in the national economy a significant number of jobs that she could perform consistent with her age, education, work history, and residual functional capacity. (Tr. 447). Consequently, the ALJ concluded that Farstad was not disabled as defined in the Social Security Act. (Tr. 447).

## II.    LEGAL DISCUSSION

### A.    Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   It  is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."  Id.   Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.


**B.      Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)      whether the claimant is presently engaged in a substantial gainful activity,

(2)      whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[4]  E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005).   Claimant's

---

[4]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence. This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner. The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>
> . . . .
>
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

---

    2. the duration, frequency and intensity of the pain;
    3. precipitating and aggravating factors;
    4. dosage, effectiveness and side effects of medication; and
    5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322. The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner.  The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law.  20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Pearsall v. Massanari, 274 F.3d at 1217.

**C.    Analysis and discussion**

**1.    The record considered by the ALJ contains substantial evidence supporting his decision**

The ALJ concluded that Farstad was mentally and physically impaired during the period of the claimed disability, and as of March 31, 2006, but not to the point where she was unable to perform simple, routine, repetitive work on a full-time basis.  The ALJ also concluded that work existed in the national economy in significant numbers that was within Farstad's residual functional capacity.

After careful review, the undersigned concludes that the record considered by the ALJ contains substantial evidence supporting his decision.  This evidence has been addressed in the ALJ's written decision and is also accurately summarized in the Commissioner's brief.  Consequently, rather than repeat the same discussions, it more productive at this point to address Farstad's complaints about the ALJ's decision and then address the additional evidence submitted to the Appeals Council that was not considered by the ALJ.

Farstad maintains that she is incapable of sustaining competitive employment regardless of exertional demands, dismissing any suggestion that a prospective employer would likely

accommodate her disabilities, tolerate her frequent absences, and allow her to work irregular hours at a slower pace.  She criticizes the ALJ for what she perceives as his failure to properly evaluate the evidence and apply the appropriate medical listings.  Specifically, she contends that the ALJ: (1) improperly dismissed Nurse Anderson's opinion; (2) erred by failing to follow up with her treating physicians or otherwise solicit testimony from a medical expert; and (3) failed to throughly evaluate the intensity and persistence of her symptoms.  She also contends that the Appeals Council failed to consider and properly take into account the additional evidence that was presented to it that was not considered by the ALJ.

### 2.    Nurse Anderson

Farstad claims that the ALJ failed to give appropriate weight to Nurse Anderson's observations and assessments, particularly with respect to Farstad's functional capacity. She stresses the fact that Anderson's examining relationship had been longstanding, her counseling and examinations frequent, and that her opinions were consistent with those expressed by other health care providers.

There is no dispute that Nurse Anderson did not constitute an "acceptable medical source" as defined by the applicable regulations.[5]   The SSA has recognized, however, that information obtained from someone other than an "acceptable medical source" has evidentiary value.

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Sloan v. Astrue, 499 F.3d 883, 888-89 (8th Cir. 2007) (quoting SSR 06-03p).  It has therefore directed ALJs to evaluate medical opinions regardless of its source.

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions....
>
> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

---

[5] SSA regulations divide information sources into two main groups: *acceptable medical sources* and *other sources*.  They further subdivide *other sources* into two groups: *medical sources* and *non-medical sources*. 20 C.F.R. §§ 404.1502, 416.902 (2007).  *Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § 404.1513(a), 416.913(a) (2007).  *Other sources: medical sources* include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists.  20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

There are three major distinctions between *acceptable medical sources* and the others: (1) only *acceptable medical sources* can provide evidence to establish the existence of a medically determinable impairment, id., (2) only *acceptable medical sources* can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only *acceptable medical sources* can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

Id.; see also Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005); 20 C.F.R. § 416.927(d) (listing the factors that are considered when assigning weight to a medical opinion). But, in determining what weight to give "other medical evidence," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.

In this case, the ALJ appropriately observed that Nurse Anderson could not provide evidence to establish a medically determinable impairment as she was not an "acceptable medical source." (Tr. 436-437, 445). The ALJ's analysis did not end there, however. He went on to consider Nurse Anderson's opinions and assessments with respect to whether Farstad had a listing-level impairment and with respect to her RFC, but discounted them because of perceived inconsistencies with the objective medical evidence, Farstad's admitted daily and business activities, the evaluations and treatment by the other medical-care providers, and the assessments by the agency consultants. (Tr. 436-437, 445-446) And, in doing so, the ALJ cited to specific record evidence as detailed in his opinion and the Commissioner's brief.

In summary, contrary to Farstad's assertions, it is apparent from the record that the ALJ complied with the SSA's policy directives in terms of giving due consideration to Nurse Anderson's opinions and conclusions, but that he discounted them to a degree in light of the other evidence.

### 2.      Treating physicians

Farstad contends that the ALJ failed to develop the facts fully and fairly in that he "improperly rejected the opinions of the treating and evaluating physicians without requesting additional information from the physicians seeking clarification."

The ALJ has a duty to develop the record fairly and fully, independent of the claimant's burden to press his case. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "Although that duty may include recontacting a treating physician for clarification of an opinion, that duty arises only

if a crucial issue is undeveloped." Id.; see also Sultan v. Barnhart, 363 F.3d 857, 863 (8th Cir. 2004) ("The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim."); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); Social Security Ruling 96-5p (1996), 1996 WL 374183, at *2, *5 (requiring an ALJ to make a reasonable effort to recontact a treating source who offers an ultimate-issue opinion for clarification of reasons if he cannot ascertain the basis of the opinion from the case record); 20 C.F.R. § 404.1512(e) (discussing under what circumstances the SSA will recontact medical sources). Such is not the case here, however.

Here, the ALJ was presented with detailed medical records sufficient for determining the merits of Farstad's disability claim. Thus, there was no obvious imperative for the ALJ to seek clarification from Farstad's treating and evaluating physicians.

The ALJ did not discount the opinions of Farstad's treating and evaluating physicians out of confusion or lack of information. Rather, he discounted their opinions on the grounds that they were based largely on Farstad's subjective complaints, which he found inconsistent with the record as a whole, including: the objective medical evidence of Dr. Anderson's neurological examination; Farstad's own descriptions of her activity level; and the evaluations and recommended treatment of other medical-care providers, including Dr. Thomas-Espen, Dr. Lampman, the Trinity Adult Partial Hospitalization Program, and the Mayo Clinic. (Tr. 436-437, 436-446).

Also, with respect to Dr. Anwar, the ALJ noted that his opinions regarding the severity of Farstad's impairments during the period of his assessment were inconsistent with his own treatment notes during the same period and the neurological tests. Dr. Anwar opined that, between April and

June 2003, Farstad was seriously limited and could not meet competitive standards in most mental work-related activities, was unable to function independently outside of her home, and could be expected to miss a week or more of work per month. (Tr. 902-09). However, his treatment notes from March through June 2003 reflect that Farstad appeared alert and oriented, demonstrated "pretty good concentration," suffered from mild memory impairment, and exhibited a significantly improved mood. (Tr. 820, 833). These notes also echoed the results of neurological tests, that Farstad possessed "high average" concentration and average recall. (Tr. 436, 445, 824).

In summary, the ALJ carefully considered the opinions and assessments of Farstad's treating medical-care providers. He gave their opinions and conclusions some weight in terms of a reduced RFC, but discounted them to the extent that he was not persuaded that Farstad was so impaired that she could not have engaged in substantial gainful activity. And, to the extent that he did not accord full weight to their opinions and conclusions, he gave reasons that were supported by substantial record evidence, following SSA policy guidance.

### 3.        Credibility assessment

Farstad next takes issue with the ALJ's credibility assessment, averring that he failed to consider the side effects of her medications, the severity of her migraines, and the persistence of her systems. The record indicates otherwise, however.

The ALJ was troubled by conflicting evidence regarding Farstad's engagement in business activities. At the administrative hearing, Farstad testified that her nephew started the business and that she had merely loaned him money. (Tr. 435, 440, 1405) However, the record is littered with statements by Farstad to her medical care providers about her engagement in a business that obviously was hers initially. (Tr. 762, 770, 765-767, 814, 817, 1141, 1143, 1145, 1240, 1243). For example, in 2003 and again in 2004 she expressed a desire to work. (Tr. 814, 817) Therapist notes

from late 2004 reference Farstad's efforts to start a new business venture.  Notes from January 2005 indicate that Farstad's business obligations were keeping her busy, that she had attended a trade show of sorts in Las Vegas, and that she had sought out assistance from her nephew. (Tr. 765-767). Progress notes dated April 7, 2005, reveal that Farstad had rented space out of which to operate the business. (Tr. 1143).  They further state Farstad had "identified that she will not be able to be consistently open every day as she struggles making 20 hours a week as far as working and does not feel that she can do 40 hours a week." (Tr. 1143).  Regardless of Farstad's role in the business, it is apparent that she was engaging in some level of business activities that were inconsistent with her description of that activity during her testimony, as well as with her claims of impairment generally. Thus, the ALJ was not out of bounds when questioning her credibility.  Melton, 181 F.3d at 942; Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Farstad's ability to engage in activities of daily living further eroded Farstad's credibility in the ALJ's eyes.  The ALJ noted Farstad's business and personal travel, reported improvements in her concentration and mood, her exercise routine, the taking up of outdoor photography, and her independence in all activities of daily living.  (Tr. 440-441)

Turning to the matter of Farstad's subjective complaints, the ALJ did not simply ignore them as Farstad has suggested.  He acknowledged that Farstad's impairments did impose a certain degree of limitation.  However, he observed inconsistencies and incongruities in the record that led him to question the intensity and severity of her pain, her claimed inability to concentrate, and inability to work at any level.  (Tr. 441-442)

The ALJ initially observed there was a dearth of objective medical evidence that lent support to Farstad's claims.  He took particular note of Farstad's neuropsychological examination, the results of which were not indicative of an individual with substantial limitations.  Rather, the examination

40

revealed that Farstad was in the average to high average range in virtually all measurable categories of memory, concentration, and language function. (Tr. 442)

Next, the ALJ highlighted statements made by Farstad to her therapists and physicians about her concentration, memory, and mood that in his opinion were not indicative of an individual in acute distress. For example, in June 2003, she reported that her thinking was clearer. In May 2004 she reported success in managing her anxiety. (Tr. 787). In June 2004 she reported that she was doing quite well from an emotional standpoint and that she had cut back on a number of her medications. (Tr. 783). Between May and November 2004 she expressed concern about "mini-episodes of mania" as well as her ability to manage her finances. (Tr. 770-78). However, by early 2005, she was reporting that, with the use of coping strategies, her outlook had improved and she was planning on taking back control of her finances. (Tr. 762-768).

The ALJ was also unable to reconcile Farstad's subjective pain complaints with her repeated statements that she was doing fairly well from a pain standpoint and that her physical health had improved. With respect to Farstad's migraine headaches, he concluded that Farstad's statements about their intensity were not borne out by the objective medical evidence.

> In June of 2004, the claimant stated that she was doing fairly well as far as her chronic pain, and she has not needed the nap in the afternoon. On November 24, 2004 she noted that her physical health had improved. She also reported a great deal of improvement in her concentration and cognitive thinking. November of 2005 she complained of occasional headaches, but was given a liquid medication to help tolerate them. She also testified that Imitrex and Relpax help her migraines. Although the claimant testified that she has 3-4 migraines a month for 2-3 days that are debilitating, the medical record does not indicate any report of migraines at such a level. In February 2006 she had a physical workup and admitted that she was actually very healthy. She stated that she was physically doing very well on her current medications. The claimant denied any troubles with her energy, appetitive, concentration, sleep, or mood. She stated that she was physically doing very well prior to March of 2006 when she decreased her medications and stopped taking her afternoon naps, and caught a cold.

41

Subsequent to the hearing, the claimant was admitted to the Mayo Psychiatry & Psychology Treatment Center on January 20, 2006, and discharged on January 31, 2006.  At the Mayo Clinic she was diagnosed with bipolar disorder; ruled out generalized anxiety disorder; and borderline personality disorder.  The Mayo Clinic noted her questionable inflammatory joint disease, and noted that her symptoms sound more like palindromic rheumatism.  She was not given a definite diagnosis of rheumatoid arthritis.  This is consistent with the statement of James Lampman, M.D., who stated that the claimant's musculotendinous aches and strains were distracting and troublesome, but not dangerous, and he projected an optimistic outlook for the future.  According to Dr. Lampman, these symptoms can be self managed.  The Mayo Clinic recommended Naprosyn as needed, with an occasional Medrol dose pack for flares.  There was no recommendation of any kind of specific daily remitive therapy.

(Tr. 443 (internal citations to exhibits omitted)).

As for Farstad's medications, the ALJ noted that Farstad's prescriptions on admission to the Mayo Clinic in January 2006 were neither consistent with nor extensive as with those listed at the time of her administrative hearing.  He further noted that the Mayo Clinic had directed Farstad to discontinue a number of her medications. Finally, upon reviewing the record, he highlighted what he considered to be Farstad's failure to adhere to her prescribed treatment as well as statements Farstad made in January 2005 denying any medicinal side effects.

Finally, although not mentioned by name, it is apparent that the <u>Polaski</u> factors formed the ALJ's analysis.[6]  The ALJ addressed Farstad's subjective pain complaints at length.

Having reviewed the evidence, the ALJ did not err in discrediting Farstad's testimony.  The ALJ considered Farstad's subjective complaints, but partially discounted them.  And, the reasons he articulated for doing so are supported by substantial evidence based on the record as a whole.  <u>See</u> <u>Haggard v. Apfel</u>, 175 F.3d at 594; <u>Brockman v. Sullivan</u>, 987 F.2d at 1346.  As noted earlier,

---

[6]  The ALJ stated with regard to determining credibility.  "Full consideration will be given to all evidence presented relating to subjective complaints, including, but not limited to, claimant's prior work record and observations of third parties and treating and examining physicians relating to such matters as: claimant's activities of daily living; the intensity, duration and frequency of subjective complaints such as pain, fatigue, etc.."  (Tr. 440).

the "claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d at 814.  In this case, the court must defer to the ALJ's conclusions regarding Farstad's credibility and their consequent impact on his determination of Farstad's RFC.

### 4.    The Appeals Council and the supplemental evidence

Farstad contends that the Appeals Council failed in its duty to review the record despite submissions of new and additional supporting evidence.

According to the record, Farstad filed a request for review by the Appeals Council in August 2006.  She later supplemented her request with the following: a  brief dated August 31, 2006; a Mental Impairment questionnaire for the period of September 12, 2006, to October 19, 2006, by Dr. Todor Dragicevic (Tr. 1166-1175); additional Trinity Medical Group records (Tr. 1176-1329); Tri-Life Center, L.L.P.,  records (Tr. 1330-1381); and Bismarck Health Center and other medical records.  (Tr. 425).  The Appeals Council denied Farstad's request for review on February 8, 2007, with the explanation that her new evidence did not provide a basis for changing the ALJ's decision. (Tr. 422-23).

The jurisdiction of this court is confined to reviewing the final decision of the Secretary and not the denial of review by the Appeals Council.  Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995).  But, when the Appeals Council has considered "new and material evidence," this court must determine whether the ALJ's decision is supported by the entire record, including the additional evidence provided it is in fact "new and material."  E.g.,  O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); id.

In this case, much of the additional medical evidence that was submitted postdates the period of eligibility that ended on March 31, 2006, and, for this reason alone, is of lesser relevancy.

Further, the worsening of Farstad's drug dependency in 2006 is another reason for not attributing to the evidence the significance that Farstad gives it.

More particularly, Farstad argues that the Appeals Council failed to give proper consideration to the conclusions of Dr. Todor Dragicevic, a Minot psychiatrist, that was part of the supplemental information submitted to the Appeals Council. As already noted in the background section, Dr. Dragicevic made his assessment in October 2006. He concluded that Farstad's functional capacity was seriously limited by her mental impairments and that she would be unable to meet competitive standards in most areas. He also concluded that she would have four or more episodes of decompensation within a twelve month period. (Tr. 1166-75).

There are a number of problems with Dr. Dragicevic assessment, however. First, by its terms, the assessment was limited to the period from September 12, 2006, to October 19, 2006, which is after the eligibility cutoff date of March 31, 2006. (Tr. 1175)

Second, the assessment was made upon the assumption that Farstad had been substance abuse free for many years and that drug abuse was not contributing to her mental impairment. (Tr. 1174-75). Obviously, this was an incorrect assumption given the admissions made by Farstad, within days after the assessment was completed, that she had been regularly using marijuana and abusing prescription drugs for a number of years.

Third, the assessment was made during the time frame of the latter part of 2006, when Farstad's drug abuse was spiraling out of control based upon observations of family members and Farstad's later admissions. Consequently, the severity of the impairment that was reported, even if credible, is of doubtful relevance for the period that Farstad was eligible for DIB benefits, which ended some six months earlier on March 31, 2006. This is particularly true given the evaluation that

was performed at the Mayo Clinic in January 2006, since there is indication in Mayo's evaluation that Farstad was impaired to the degree suggested by Dr. Dragicevic's assessment.

In summary, when the additional evidence is considered, it does not change the conclusion that the ALJ's decision is supported by substantial evidence.  If anything, the admission by Farstad in November 2006, that she had been abusing prescription drugs and regularly smoking marijuana during the entire period of her claimed disability - facts that were not known by the ALJ-  supports the ALJ's determination.  42 U.S.C. § 423(d)(2)(C);  see Vester v. Barnhart, 416 F.3d 886, 888-892 (8th Cir. 2005).  The fact that Farstad had not been candid about her substance abuse with her treating medical-care providers or during her testimony before the ALJ supports the credibility determinations made by the ALJ.  Further, it is readily apparent that a number of things that Farstad claims as limiting her functional capacity, *e.g.*, her inability to concentrate, memory impairment, lack of energy, and drowsiness, can be attributed, at least in part, to the substance abuse.  Cf. Vester v. Barnhart, 416 F.3d 886, 891 (8th Cir. 2005).  Moreover, there is medical evidence that supports this conclusion.  For example, after having been under the controlled environment of the Mayo Clinic for a period of time, Farstad was discharged in "good condition," and, shortly after her return home, Nurse Anderson described Farstad as a "very bright, much more insightful, pleasantly appearing 46-year old female," who was in a good mood, had clear thought processes, and was denying any troubles with her energy, appetite, concentration, sleep, or mood. (Tr. 1157)  Similar conditions were observed after Farstad was weaned from some of medications during her earlier participation in the TAPH program in 2003 (Tr. 442, 806-809, 811, 814, 816) and later during her

involuntary commitment and completion of the Tri-Life program in late 2006. (Tr. 1176-78; 1330-1335).[7]

## III.   CONCLUSION AND RECOMMENDATION

In this case, ALJ correctly applied governing SSA law, regulations, and policy guidance, and there is substantial evidence supporting the Commissioner's decision even after considering the supplemental evidence submitted to the Appeals Council.   As long as there is substantial evidence supporting the decision, this court may not reverse it simply because there is substantial evidence supporting a contrary outcome or because the court would have decided the case differently.  Holley v. Massanari, 253 F.3d 1088,  1091 (8th Cir. 2001).  Accordingly, it is **RECOMMENDED** that the Commissioner's Motion for Summary Judgment be **GRANTED** and that this matter be **DISMISSED**.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 25th day of February, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

---

[7]  Under governing SSA law, Farstad is not entitled to benefits if drug abuse is a "contributing factor material to the Commissioner's determination" of a disability.  42 U.S.C. § 423(d)(2)(C);  see, e.g., Vester v. Barnhart, 416 F.3d at 888-892.  And, "[i]n the determination whether the substance abuse is 'material,' the claimant has the burden of demonstrating that she would still be disabled if she were to stop using the drugs or alcohol."  Vester v. Barnhart, 416 F.3d at 888; see 20 C.F.R. § 416.935(b)(1).  If for any reason it would not be possible to grant the Commissioner's motion for summary judgment, it appears this matter would have to be remanded to the Commissioner for a determination of whether Farstad has met her burden of proof in light of the admitted substance abuse during the period of claimed disability, which was not considered by the ALJ.